IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| | Case No. 7:09-CR-8-WLS |
| DWAIN D. WILLIAMS | |

## MOTION TO DISMISS INDICTMENT

Comes now the Defendant, Mr. Dwain D. Williams, by and through the undersigned counsel, Morad Fakhimi; and pursuant to Fed. R. Crim. P. 12(b)(3)(B), herewith moves to dismiss the indictment under which he was charged in the instant case on grounds that it fails to invoke this Court's jurisdiction over the charged conduct. Particularly, Mr. Williams maintains that the statute by which this indictment seeks to establish this Court's subject matter jurisdiction over alleged conduct, conduct which transpired entirely outside the territorial or special maritime or admiralty jurisdiction of the United States, is unconstitutional. Accordingly, Mr. Williams challenges the *Military Extraterritorial Jurisdiction Act of 2000*[1] as a violation of the venue and compulsory process provisions of the Sixth Amendment to the United States Constitution – requiring the indictment (Doc. 1) to be dismissed with prejudice.

Essentially, Mr. Williams maintains that the Sixth Amendment, speaking in absolute terms, does not allow Congress to punish conduct that transpires exclusively on foreign soil, which renders the Act, on its face, unconstitutional; and, as applied here, the Act would effectively eviscerate Mr.

---

[1] Act November 22, 2000, Pub. Law 106-523, 114 Stat. 2488 — codified at 18 U.S.C. § 3261, *et seq*. (hereafter, the "Act").

1

Williams's rights to have compulsory process for securing the presence of witnesses in his favor, as this Court's power to compel the presence of those witnesses is nonexistent. The result of which is that any consequential trial would be rendered fundamentally unfair. In support of this argument, Mr. Williams respectfully submits the following.

On July 14, 2009, Mr. Williams was charged in a two-count indictment with having effected inappropriate sexual contact with a minor, in violation of 18 U.S.C. §§ 2241(c), 2244(a)(1), and 2244(a)(5). However, the indictment alleges that this conduct transpired somewhere in Okinawa, Japan; with federal jurisdiction being asserted under 18 U.S.C. § 3261(a)(1). (*See* Doc. 1). In pertinent part, the Act's jurisdictional grant provides that,

> "[w]hoever engages in conduct <u>outside the United States</u> that would constitute an offense punishable by imprisonment for more than 1 year <u>if</u> the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States – while...accompanying the Armed Forces outside the United States...shall be punished as provided for that offense."

18 U.S.C. § 3261(a)(1) (emphases supplied).

The Act also provides that no such prosecution may be commenced in the United States against a person under this section if a foreign government has instituted criminal proceedings in the forum nation for that conduct, *unless* the Attorney General or Deputy Attorney General chooses to permit the duplicate trial. *See* § 3261(b). The Act defines the term "accompanying the Armed Forces" as requiring the following elements:

> **a dependent** of a member of the armed forces [or of] a civilian employee of the Department of Defense...[or of] a Department of Defense contractor (including a subcontractor at any tier) or an employee of a Department of Defense contractor (including a subcontractor at any tier)...**residing with** such member, civilian employee, contractor, or contractor employee outside the United States; and **not a national of or ordinarily a resident in the host nation**.

2

18 U.S.C. § 3267(2) (emphases supplied).

Thus, the Act purports to extend federal criminal jurisdiction, not simply beyond our borders, but well into the sovereign jurisdiction of foreign countries. If a dependant of a member of the Armed Forces, residing with that member abroad (but not on U.S. property such as a military base), and not ordinarily a resident or national of the host nation, commits any act that **would have been** a felony **if** it were committed within the special maritime and territorial jurisdiction of the United States, then the Act purports to confer jurisdiction to American federal courts to try and punish that conduct, notwithstanding the fact that it was neither committed on American soil, nor within the maritime, admiralty, or "special" territorial land jurisdiction of the United States, as those terms are defined in 18 U.S.C. § 7.[2]

---

[2]The "special maritime and territorial jurisdiction of the United States" is defined in § 7 as including:

> (1) The high seas...and any vessel belonging in whole or in part to the United States or any citizen [or corporation] thereof... when such vessel is within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State.
>
> (2) Any vessel registered...under the laws of the United States, and being on a voyage upon the waters of any of the Great Lakes, or any of the waters connecting them, or upon the Saint Lawrence River where the same constitutes the International Boundary Line.
>
> (3) Any lands reserved or acquired for the use of the United States...for the erection of a fort, magazine, arsenal, dockyard, or other needful building.
>
> (4) Any island, rock, or key containing deposits of guano, which may, at the discretion of the President, be considered as appertaining to the United States.
>
> (5) Any aircraft belonging in whole or in part to the United States, or any citizen [or corporation] thereof...while such aircraft is in flight over the high seas, or over any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State.
>
> (6) Any vehicle used or designed for flight or navigation in space...while that vehicle is in flight...
>
> (7) Any place outside the jurisdiction of any nation with respect to an offense by or against a national of the United States.
>
> (8) To the extent permitted by international law, any foreign vessel during a voyage

Notably, the conduct alleged in this indictment did not occur anywhere within the "special maritime and territorial jurisdiction of the United States" as defined in § 7. Thus, since the indictment's only recitation of a jurisdictional statute is § 3261 (*see* Doc. 1), it logically follows that the alleged conduct transpired <u>exclusively</u> within the sovereign territory of Japan. Generally speaking, every nation has "territorial jurisdiction" over crimes committed within its borders. *See Wilson v. Girard*, 354 U.S. 524, 529-30(1957) ("A sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction."); *see also*, 45 Am. Jur. 2d, International Law § 62 & 64 (1999). The question then becomes: under what Constitutional grant of authority did Congress pass this statute purporting to convey subject matter jurisdiction to American federal courts for trial and punishment of conduct that transpires exclusively within the sovereign jurisdiction of a foreign country?

Before that question is addressed, a brief account of the backdrop of the "problem" sought to be addressed by the Act should be rendered. Traditionally, civilians accompanying American forces abroad were subject to court martial jurisdiction for crimes they committed on foreign soil; however, in 1956, the Supreme Court rejected the notion that civilians can be subjected to court

---

having a scheduled departure from or arrival in the United States with respect to an offense committed by or against a national of the United States.
(9) With respect to offenses committed by or against a national of the United States...
    (A) the premises of United States diplomatic, consular, military or other United States Government missions or entities in foreign States...
     (B) residences in foreign States and the land appurtenant or ancillary thereto, irrespective of ownership, used for purposes of those missions or entities or used by United States personnel assigned to those missions or entities.

martial under the Uniform Code of Military Justice[3] during peacetime; the result of which was to eliminate American extraterritorial jurisdiction over crimes committed by American civilians on foreign soil while accompanying its forces overseas.  *See generally Reid v. Covert*, 351 U.S. 487 (1956); and *Kinsella v. Krueger*, 351 U.S. 470 (1956); *see also Grisham v. Hagan*, 361 U.S. 278 (1960); *McElroy v. United States ex rel. Guagliardo*, 361 U.S. 281 (1960); and *United States ex rel. Toth v. Quarles*, 350 U.S. 11 (1955). In doing so, the Court noted that its previous decisions along these lines — notably, *In re Ross*, 140 U.S. 453 (1891), and the insular cases[4] – had become anachronistic, and that their application should be limited to their facts. Accordingly, from 1956 until 2000, the date of the passage of the Act, there existed what was referred to by courts and commentators alike as a "jurisdictional void" – allowing extraterritorial crimes committed by American civilians accompanying military forces on foreign soil to go unpunished whenever the forum country chose not to prosecute. As one commentator, writing in 1987, put it:

> Recourse to host country courts and administrative measures applied by American authorities are the only means presently available to deal with misconduct by these civilians...The inability or reluctance of host governments to accept jurisdiction in some cases involving American civilians creates the possibility of offenders receiving inappropriate punishment or no punishment at all. The United States policy of seeking waiver of host jurisdiction in as many cases as possible aggravates this situation. The number of cases actually released to United States authorities by host governments is small, but the potential for more serious problems exists. The search for a solution to the problem has been hampered by the Court's failure to clearly define constitutional guidelines, Congress' failure to enact legislation creating extraterritorial jurisdiction, and uncertainty about host nations' reactions to the implementation of any given solution.

---

[3]Uniform Code of Military Justice art. 2(11), 64 Stat. 108, 109 (1950).

[4]*Balzac v. Puerto Rico*, 254 U.S. 298 (1922); *Dorr v. United States*, 195 U.S. 138 (1904); *Hawaii v. Mankichi*, 190 U.S. 197 (1903); *Downes v. Bidwell*, 182 U.S. 244 (1901).

McClelland, Gregory A. (Capt. U.S. Army), *The Problem of Jurisdiction Over Civilians Accompanying the Forces Overseas -- Still With Us*, 117 Mil. L. Rev. 153, 217 (1987); *see also* Schmitt, Glen R., *Closing the Gap in Criminal Jurisdiction Over Civilians Accompanying the Armed Forces Abroad -- A First Person Account of the Creation of the Military Extraterritorial Jurisdiction Act of 2000*, 51 Cath. U. L. Rev. 55, 78, 113-14 (2001).

Additionally, just prior to consideration and passage of the Act, Congress received a special message from the United States Court of Appeals for the Second Circuit; a message to the following effect:

On appeal, Gatlin argues, inter alia, that the District Court lacked jurisdiction over his case because the offense took place on property leased by the United States military in the Federal Republic of Germany. With regret, we agree. Accordingly, we reverse the judgment of conviction and dismiss the indictment. At the same time, because the existence of this jurisdictional gap is an issue that we believe warrants serious congressional consideration, we direct the Clerk of the Court to forward a copy of this opinion to the Chairmen of the Armed Services and Judiciary Committees.

*United States v. Gatlin*, 216 F.3d 207, 209, 210, 223 (2d Cir. N.Y. 2000) ("We conclude, contrary to the District Court, that [18 U.S.C.] § 7(3) does not apply extraterritorially [to an apartment complex near a military base leased by the military for use by its personnel] * * * although Congress has not provided any jurisdiction to try civilians like Gatlin who commit crimes on military installations abroad, such individuals are usually subject to prosecution by the country in which such installations are based--in Gatlin's case, by Germany").

Thus, it was this "jurisdictional gap" that Congress sought to address with the Act. However, Congress was precluded by the express terms of the Sixth Amendment from venturing to punish crimes that occurred exclusively on foreign soil (so long as those crimes do not constitute a violation of international law).

The Constitution enumerates Congress's powers, for the most part, in Article 1, Section 8; and the only Article I power of Congress that could have even arguably been relied on in support of the Act would be either: (a) its power to regulate commerce with foreign nations, or (2) its power to define and punish piracies and felonies committed on the high seas, and offenses against the law

of nations. However, the Act seeks to do neither. The conduct alleged by this indictment (inappropriate contact with a minor) has no commercial dimension, nor does it affect commerce in any form; additionally, the charged conduct can not be construed to constitute a piracy, or to have occurred on the High Seas, or to constitute an offense against "the law of nations" (i.e., international law). Thus, the Act was not passed under any Article I power of Congress (as is reflected in Congress's findings in passing the act, discussed *infra*).

Another Constitutional source of Congressional power, however, is the final clause of Section 2 of Article III, which provides that:

> The trial of all crimes, except in cases of impeachment, shall be by jury; and such trial shall be held in the state where the said crimes shall have been committed; but when not committed within any state, the trial shall be at such place or places as the Congress may by law have directed.

U.S. Const. Art. III, cl. 2.

At first glance, and read in isolation, it appears that Article III's grant of power to Congress, to specify the location of trials for offenses *not committed within any state*, provides sufficient basis to sustain the Act in the present context. However, when viewed in conjunction with Article IV's provision for regulation of American territorial holdings, it becomes apparent that Article III's grant to the effect that Congress may set the location for trials of offenses not committed in any state, referred to American territorial holdings as opposed to crimes committed on foreign soil. Indeed, Section 3 of Article IV provides that "[t]he Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States..."; which the Supreme Court has interpreted as such:

7

> It is also true that throughout our history, Congress has exercised its power under Art. IV to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States" by creating territorial courts and manning them with judges appointed for a term of years.

*Palmore v. United States*, 411 U.S. 389, 402-03 (1973)

Nevertheless, to the extent that anything in the body of the Constitution even lends itself to a construction which would conflict with anything in any of the amendments thereto, the conflict would naturally be resolved in favor of the amendment. With that in mind, the Sixth Amendment, in pertinent part provides that:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to...have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

U.S. Const. Amend. VI

By its express terms, therefore, the Sixth Amendment, speaking in absolute terms, does not allow Congress to punish conduct that transpires exclusively on foreign soil, which renders the Act, on its face, unconstitutional. Additionally, as applied here, the Act would effectively eviscerate Mr. Williams's rights to have compulsory process for securing the presence of witnesses in his favor, as this Court's power to compel the presence of those witnesses located in Japan simply does not exist.

Accordingly, Mr. Williams maintains that the Act and the Sixth Amendment's venue and compulsory process clauses are not capable of being reconciled. To further illustrate the constitutional infirmity at play here, a brief inquiry into the Act's legislative history will illuminate the fact that Congress was so fixated on closing what it considered to be a "loophole" that it ignored the questions of whether or not the Constitution empowered it to legislate in this arena at all, or if

the Act's provisions would result in fundamentally unfair trials in derogation of the right to compulsory process. In pertinent part, Congress supported the Act with the following findings:

>       (7) Many thousand civilian employees of the Department of Defense, civilian employees of Department of Defense contractors, and civilian dependents accompany the Armed Forces to installations in foreign countries.
>
>       (8) Misconduct among such civilians has been a longstanding problem for military commanders and other United States officials in foreign countries, and threatens United States citizens, United States property, and United States relations with host countries.
>
>       (9) Federal criminal law does not apply to many offenses committed outside of the United States by such civilians and, because host countries often do not prosecute such offenses, serious crimes often go unpunished and, to address this jurisdictional gap, Federal law should be amended to punish serious offenses committed by such civilians outside the United States, to the same extent as if those offenses were committed within the special maritime and territorial jurisdiction of the United States.
>
> 145 Cong. Rec. S. 8194, 8195 (findings entered upon Senate consideration and passage).

Additionally, as reflected in the findings of the House, the Act was never contemplated as an attempt to either regulate foreign commerce, or to address piracy or felony on the High Seas, or to address any violation of international law:

>       Because many crimes, such as sexual assault, arson, robbery, larceny, embezzlement, and fraud, currently do not have extraterritorial effect, there is a "jurisdictional gap" that, in many cases, allows such crimes to go unpunished. Although host foreign nations have jurisdiction to prosecute such acts committed within their nation, they frequently decline to exercise jurisdiction when an American is the victim or when the crime involves only property owned by Americans.
>
>                                       * * *
>
>       While some Federal criminal statutes are expressly extraterritorial, (citing 18 U.S.C. Section(s) 32 (destruction of aircraft); 18 U.S.C. Section(s) 1837 (economic espionage and theft of trade secrets); 18 U.S.C. Section(s) 2332 (terrorism); 18 U.S.C. Section(s) 2401 (war crimes)), most make the acts described therein criminal only if they are committed within "the special maritime and territorial jurisdiction of

the United States" (citing 18 U.S.C. 7) or if they affect interstate or foreign commerce. Therefore, in most instances, Federal criminal jurisdiction ends at the nation's borders. State criminal jurisdiction, likewise, ends at the boundaries of each State. Because of these limitations, acts committed by civilians accompanying the Armed Forces in foreign countries, which would be crimes if committed in the United States, often do not violate either Federal or State criminal law. And, as discussed above, they also are not violations of the UCMJ unless a "time of war" had been declared by Congress when the acts were committed. As a result, these acts are crimes, and therefore punishable, only under the law of the country in which they occurred.

106 H. Rpt. 778

The findings of the House reiterate the notion that those federal criminal statutes that are extraterritorial in reach either address matters within the special territorial and maritime jurisdiction of the United States (grounded in Congress's Article I power to define and punish piracies and felonies on the high seas, and offenses against the law of nations); or they affect interstate or foreign commerce (grounded in Congress's Article I power to regulate commerce with foreign nations, and among the several states). The findings of both houses are abundantly clear on the notion that there has been discontent that foreign nations do not prosecute crimes committed by American dependants on their soil as often we would like. Thus, both chambers of the Congress focused on what was perceived to be a problem, and sought to remedy it by creating a fictional federal criminal jurisdiction – one that was not only not based in any Constitutional grant of authority, but antithetical to the express commands of the Sixth Amendment. Further, Mr. Williams notes that in the nine years that have passed since the Act became law, only a handful of such cases have been brought.[5] This

_____

[5]In searching for cases brought under the Act's jurisdictional grant over the last nine years, the undersigned has only been able to identify the following five cases: *United States v. Holmes*, 618 F. Supp. 2d 529, 540 (E.D. Va. 2009); *United States v. Gleason*, 2009 U.S. Dist. LEXIS 24800 (D. Or. Mar. 23, 2009); *United States v. Slough*, 2008 U.S. Dist. LEXIS 99041 (D. Utah Dec. 8, 2008); *United States v. Green*, 2008 U.S. Dist. LEXIS 65379 (W.D. Ky. Aug. 26, 2008); *United States v. Arnt*, 474 F.3d 1159, 1161 (9th Cir. Cal. 2007).

indicates that the magnitude of the problem caused by the existence of this "loophole" was exaggerated.

At least one logical reason for the maintenance of territorial limits on ordinary federal criminal jurisdiction (which is to say, not including piracy on the High Seas or violations of international law) is that such is the limit of the federal judicial power with respect enforcing a defendant's rights under the compulsory process clause. The conflict at play here, between Congress's desire to not let crimes committed on foreign soil go unpunished, and Mr. Williams's Sixth Amendment right to compel the presence of witnesses favorable to his defense, must be resolved in his favor – as Congress's desire to have such a trial cannot be so great as to convince this Court that a fundamentally unfair trial is better than no trial at all. As Justice Clark put it in his dissenting opinion in *Reid v. Covert*:

> compulsory process is essential to any system of justice. The attendance of foreign nationals as witnesses at a judicial proceeding in this country could rest only on a voluntary basis and depositions could not be required. As a matter of international law such attendance could never be compelled and the court in such a proceeding would be powerless to control this vital element in its procedure.

*Reid v. Covert*, 354 U.S. at 88 (1957) (Clark, J., dissenting).

Also, the commands of the Sixth Amendment, with respect to the question of proper venue in criminal proceedings, were always a matter of great concern to our Nation's founders. Their complaints against the Crown, enumerated in the Declaration of Independence, did not fail to mention their disdain for the British practice of transportation of colonists "beyond Seas to be tried." Furthermore, the Constitution itself twice safeguards the defendant's right to proper venue: Article III, § 2, cl. 3 instructs that the "[t]rial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed"; further, the Sixth Amendment calls for trial "by an impartial

11

jury of the State and district wherein the crime shall have been committed", requiring also that the district be previously established by Congress. Additionally, Rule 18 of the Federal Rules of Criminal Procedure, echoing the constitutional commands, maintains that "prosecution shall be had in a district in which the offense was committed."

With the exception of those circumstances in which Congress has authorized nationwide service of process, before a non-resident defendant may be compelled to defend even a simple civil case, the plaintiff has to show that the defendant has sufficient minimum contacts with the forum state to justify the exercise of personal jurisdiction therein. In most criminal cases, however, the required degree of contact is easily shown by the defendant's presence and actions in the forum state, or by actions directed toward the forum state. *See United States v. Cabrales*, 524 U.S. 1, 9 (1998) (explaining that where the crime is an illegal mailing, venue is constitutionally proper both where the mailing was sent and where it was to be delivered); *Armour Packing Co. v. United States*, 209 U.S. 56, 76-77 (1908) (holding that venue was constitutionally permissible in district through which illegal shipment in interstate commerce passed). However, exclusively extraterritorial conduct, occurring only on foreign soil is another matter entirely.

Traditionally, federal courts have only allowed for extraterritorial application of American criminal law only where the conduct in question had or would have a deleterious effect within the United States, *see United States v. Bowman*, 260 U.S. 94, 98 (1922) (approving extraterritorial application of criminal statutes "because of the right of government to defend itself against obstruction or fraud wherever perpetrated, especially if committed by its own citizens"); and certainly only where such an application of the law would be reasonable, *see United States v. Clark*,

315 F. Supp. 2d 1127, 1132 (W.D. Wa. 2004) ("Even if principles of international law serve as bases for extraterritorial application of the law, international law also requires that such application of the law be reasonable.") (citation omitted). Ordinarily, reviewing courts presume that Congress legislates against the backdrop of the presumption that laws do not apply extraterritorially, and that presumption may only be overcome by a clear expression from Congress of a contrary intent. *See Nieman v. Dryclean U.S.A. Franchise Co., Inc.*, 178 F.3d 1126, 1129 (11th Cir. 1999) (finding that language in the Federal Trade Commission Act, 15 U.S.C. § 41 et seq., does not clearly indicate that Congress intended the Act to apply extraterritorially). However, the Act under which Mr. Williams's case was brought into this Court is absolutely unambiguous in its intent to reach onto foreign soil; accordingly, this Indictment, which addresses actions committed exclusively on foreign soil should be dismissed.

By way of analogy, the well established principle that extraterritorial imprisonment renders habeas corpus relief unavailable lends support Mr. Williams's argument. The present situation is concerned, indirectly, with *the reach of a federal court* as to conduct transpiring on foreign soil that was neither a violation of "the law of nations" nor affected foreign or interstate commerce; the concern is indirect in that what is really at issue here is the power of Congress to extend that reach. Nonetheless, if this Court does not have jurisdiction to entertain a petition for writ of habeas corpus submitted on behalf of a man detained on foreign soil by American authorities simply by virtue of his geographical location (assuming a respondent were found in this district with the power to obey the Writ and release the prisoner), then it must logically follow that if that man can not reach this Court, likewise this Court can not reach him. In defiance of such logic, Congress passed the Act,

which can fairly be characterized as a federal criminal "long-arm" statute, creating a Constitutionally flawed global jurisdiction that renders compulsory process unavailable.

In 1950, the Supreme Court held that American federal courts can not entertain habeas corpus petitions filed on behalf of a number of German nationals held by American authorities in China, simply by virtue of the extraterritorial locus of their imprisonment. *Johnson v. Eisentrager*, 339 U.S. 763, 791 (1950); *see also In re Yamashita*, 327 U.S. 4, 4 - 6, 13 - 15, 26 (1946) (denying federal court jurisdiction for consideration of federal habeas corpus petition filed on behalf of Japanese General Tomoyuki Yamashita, who was being held under a death sentence that had been affirmed by the Supreme Court of the Phillippines); and *Hirota v. MacArthur*, 338 U.S. 197, 197 (1948) (*per curiam*). As recently as 2004, the Court, distinguishing *Eisentrager*, held that federal courts do have jurisdiction to entertain habeas corpus petitions filed by prisoners held at the Naval Base in Guantanamo Bay, Cuba because "[b]y the express terms of its agreements with Cuba, the United States exercises "complete jurisdiction and control" over the Guantanamo Bay Naval Base, and may continue to exercise such control permanently if it so chooses." *Rasul v. Bush*, 542 U.S. 466, 481 (2004). Thus, at the precise place and time that the alleged conduct in this case occurred, had Mr. Williams been a prisoner of a respondent in this district (though jailed at the precise location in Okinawa that the alleged conduct transpired) he would be denied access to this Court simply by virtue of his geographical location. Consequently, this Court should not allow its criminal jurisdiction to be invoked as to the charged conduct for that same reason

.

14

**Conclusion**

Based on the forgoing arguments, Mr. Williams invokes his right under the United States Constitution (the Sixth Amendment's venue and compulsory process clauses); and, pursuant to Fed. R. Crim. P. 12(b)(3)(B), he respectfully requests that this Court dismiss the indictment against him on grounds that it fails to invoke this Court's jurisdiction over his conduct due to the invalidity of the jurisdictional statute under which he was charged. Which is to say that the Sixth Amendment, speaking in absolute terms, does not allow Congress to punish conduct that transpires exclusively on foreign soil, which renders the Act, on its face, unconstitutional; and, as applied here, the Act would effectively eviscerate Mr. Williams's rights to have compulsory process for securing the presence of witnesses in his favor, as this Court's power to compel the presence of those witnesses located in Japan does not exist. The result of which is that any consequential trial would be rendered fundamentally unfair.

Dated:  This 5th day of November, 2009.

Respectfully submitted,

Cynthia W. Roseberry – Executive Director
Federal Defender Program – Middle District of Georgia

By:

/s/ Morad Fakhimi
MORAD FAKHIMI
PA Bar ID. 204228 — DC Bar ID. 974050
Federal Defender Program – Middle District of Georgia
440 Martin Luther King, Jr. Boulevard, Suite 400
Macon, Georgia 31201
Tel:  (478) 743-4747 — Fax:  (478) 207-3419
Morad_fakhimi@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I, Morad Fakhimi, hereby certify that on November 5, 2009, I electronically filed the foregoing *Motion to Dismiss* with the clerk of Court using the CM/ECF system which will send notification of such to all counsel of record.

<u>/s/ Morad Fakhimi</u>
MORAD FAKHIMI
PA Bar ID. 204228 — DC Bar ID. 974050
Federal Defender Program – Middle District of Georgia
440 Martin Luther King, Jr. Boulevard, Suite 400
Macon, Georgia 31201
Tel:  (478) 743-4747 — Fax:  (478) 207-3419
Morad_fakhimi@fd.org

16