**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **vs.** | : | **Case No.: 7:09-CR-8-WLS-RLH** |
| | : | |
| **DWAIN D. WILLIAMS,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

**UNITED STATES' MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS INDICTMENT**

COMES NOW the United States of America, by and through its attorney, the United States Attorney for the Middle District of Georgia, Jim Crane, Assistant United States Attorney, and Mi Yung Park Trial Attorney for the Department of Justice, and files its Memorandum in Opposition to Defendant's Motion to Dismiss the Indictment.

**I.      STATEMENT OF FACTS**

The victim is a fourteen year old girl who currently resides with her maternal grandmother in Pelham, GA.  The defendant is the victim's step-father.  Defendant married the victim's mother, when the victim was two years old.  The victim however lived with her grandmother in Pelham until she was approximately eight years old.  There is no allegation of abuse during these years that victim resided with her grandmother.  The victim first lived with her mother and defendant when the family moved to Okinawa, Japan when she was eight years old and the victim's mother was assigned to the Kadena Air Force base there.

**A.      Okinawa, Japan**

The defendant raped and sexually abused the victim on numerous occasions at different

1

residences while the family resided in Okinawa, Japan.  The sexual abuse started when the victim was approximately nine years old and continued until approximately July 2008, when the victim just turned 13 years old and the family moved to Lanier County, Georgia, as result of the victim's mother's being assigned to Moody Air Force Base.

Defendant first raped and sexually abused the victim in Japan when the victim's mother was on a traveling for the Air Force on Temporary Duty Assignments (hereinafter "TDY").  The victim's two brothers were home and believed to be in their bedrooms at that time.  The victim was in her bed wearing her underwear and pajamas.  The defendant came in and asked the victim if she wanted to come to his bed and she agreed.  Once she got into bed with the defendant, he asked her whether she wanted to "play mommy and daddy" and instructed the victim to undress and lay on the bed.  The defendant then blindfolded her, got on top of her, and raped her.  After the rape, the victim redressed herself and went to her room where she cried.

The defendant's sexual abuse of the victim occurred generally during the time that the victim's mother was on TDY.  The sexual abuse occurred in various locations including her mother's bedroom, her bedroom, and in a storage room at the second residence they lived in Japan.  The defendant usually blindfolded the victim prior to raping her.  Often when defendant was home, he would instruct the victim's brothers to go play outside but would not permit the victim to.  Defendant would then rape the victim while he was alone with her in the residence.

On one occasion when the victim was in the Fifth grade and still residing in Japan, she got in trouble and was sent to her room by her step-father.  At that time, she started writing notes about the abuse and attempted to give them to her older brother who was in his room down the hallway.  The defendant however caught her and intercepted the notes.  Defendant then asked

2

whether the victim had ever told anyone about the abuse and she indicated that she had not.  The defendant punished the victim and kept her in her room.  The victim also recalled another occasion when the family lived at 5420B Bennett Street in Okinawa, Japan, when defendant sexually abused her.  The victim was about ten or eleven years old at that time.  According to the victim, the defendant used a bottle of "red stuff" on her vaginal area and her comforter was stained with this solution.

Defendant had bought the victim some cheap jewelry and a mini blue motorcycle in an attempt to keep her from disclosing the abuse.  When the victim tried to refuse the defendant's advances, the defendant would hit her with a belt or "switch" which caused welts on her back and buttocks.  Defendant told the victim that her choice was to either get beat or have sex with him.

**B.**     **Georgia**

The family returned to the United States from Japan in July of 2008 and the victim's mother was assigned to Moody Air Force Base in Georgia.  The family moved to Lanier County, Georgia, where they have been residing since returning from Japan.  Upon moving to Georgia, the defendant rarely had contact with the victim as the victim attended school during the day and defendant worked in the evenings.  In or about January of 2009 the defendant departed Georgia and began working in Afghanistan.

After returning to Georgia, the victim began exhibiting problems at school, including taking a razor blade to school on one occasion.  The victim was expelled as a consequence of that action.  The victim thereafter began residing with her grandmother in Pelham, Georgia and continues to reside there.  Sometime in mid-April 2009, a cousin of the victim (hereinafter

3

"minor Jane Doe 1") visited her.  At that time, the victim told minor Jane Doe 1 that defendant

had raped her on numerous occasions starting from when she was nine years old.  The victim

asked minor Jane Doe 1 not to disclose this information to anyone as defendant had told her that

no one would believe her, everyone would hate her, and that her mother would get into trouble.

Despite minor Jane Doe 1's effort to have the victim disclose this information to others, the

victim expressed concern that her mother would be in trouble.

On May 16, 2009 while residing with her grandmother, the victim attempted to commit

suicide.  Victim's mother had just verbally disciplined the victim and left her alone.  When the

victim's grandmother entered the room she discovered the victim with a belt around her neck

attempting to loop it over the door in an apparent suicide attempt.  Minor Jane Doe 1 and another

cousin (hereinafter "minor Jane Doe 2") were present at that time and finally convinced the

victim to tell her mother about the sexual abuse which victim finally did that day.

On the following day, May 17, 2009, the victim's mother spoke by phone with the

defendant who was still working in Afghanistan.  At that time the mother told defendant about

the victim's apparent suicide attempt and the defendant responded by asking to speak with the

victim.  The victim got on the line with her mother and the defendant.  Although the victim

expressed being upset with the defendant, no specifics were mentioned.  The victim's mother, at

some point, interrupted the conversation and accused defendant of molesting the victim.

Defendant denied this accusation, but claimed that the victim had asked him about penises and

sex, and that he had tried to explain sex to the victim by saying, "They will try to touch your

breasts like this," at which point he touched the victim's breasts.  Defendant denied doing

anything else and said he was trying to teach her so that boys would not take advantage of her.

4

The victim accused defendant of doing things to her when her mother traveled on TDY and explained that the defendant would ask her when she got in trouble whether she wanted punishment, spanking, or "the other thing."  The victim's mother then accused defendant of molesting the victim.  Defendant denied the allegation and stated that the only thing he did was put a pillow on top of her and laid on top of the pillow while both of them were clothed.  The victim denied that this was what really had happened.

The victim's mother spoke again to defendant on May 20, 2009, and took notes during that conversation.  During that conversation, defendant stated that he had talked to the victim about sex after the victim had asked him what a penis was.  The defendant said that on one occasion while the victim's mother was on TDY defendant told the victim to get into bed with him and she complied.  According to the defendant, the victim asked him how he and her mother would have sex and that he responded by showing her, but denied penetrating her.  Defendant claimed that he did not remember everything because he blanked or blacked out.  The victim's mother told defendant that according to the victim, this occurred whenever she got into trouble.  Defendant responded by stating that he told the victim that if she did not want to get a whipping, he was going to have to put her on punishment.  According to defendant, the victim would then respond that she did not want punishment.  Defendant then asked her what she wanted, and then specifically asked her whether the victim wanted him to touch her breasts.  According to the defendant, the victim responded in the affirmative and would pull down her clothes.  Defendant admitted to the victim's mother that this type of interaction occurred on a few occasions.

### C.   Recorded Phone Conversation

On May 29, 2009, a phone conversation between the victim's mother and defendant was

recorded by law enforcement with the permission of victim's mother.  During that conversation defendant stated that he had a conversation with the victim about sex and that during that conversation the victim had put on a blindfold.  Defendant indicated that he was talking to the victim about sex while they were laying in bed together.  Defendant made statements to the effect that "little boys be touching you on your chest" and then proceeded to touch her on her chest.  Also during that conversation, Defendant admitted to touching the victim's breasts and lying on top of her.  Defendant denied doing anything else to the victim.

> **D.** **Law Enforcement Interview of Defendant**

On July 15, 2009, Defendant was interviewed by law enforcement at the Air Force Office of Special Investigations at Moody Air Force Base.  The interview was recorded. Defendant denied raping the victim, but admitted to lying on top of the victim using a pillow.  Defendant further denied touching the victim on the breasts, stating that he had touched her on the shoulders and nothing more.

## II.    THE STATUTE AT ISSUE

Congress enacted the Military Extraterritorial Jurisdiction Act of 2000 (hereinafter "MEJA"), codified in 18 U.S.C. § 3161 et. seq., in response to a jurisdictional gap created by host nations' reluctance to prosecute American civilians who commit crimes in their countries, especially when the crime involved harm to either another American or against property owned by Americans.  H.R. REP. 106-778(I) (2000), 2000 WL 1008725, at *7 (Leg. Hist.).

MEJA is entitled "Criminal offenses committed by certain members of the Armed Forces and by persons employed by or accompanying the Armed Forces outside the United States" and states in relevant part,

> (a)   Whoever engages in conduct outside the United States that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States –
>
>> (1)   while employed by or accompanying the Armed Forces outside the United States; or
>> (2)   while a member of the Armed Forces subject to chapter 27 of title 10 (the Uniform Code of Military Justice)
>
> shall be punished as provided for that offense.

18 U.S.C. § 3261(a) (2009).  The term "accompanying the Armed Forces outside the United States" is defined in relevant part as,

> (A)   A dependent of – (I)   a member of the Armed Forces;...
> (B)   residing with such member...outside the United States; and
> (C)   not a national of or ordinarily resident in the host nation.

18 U.S.C. § 3267(2) (2009).  Defendant is properly charged under MEJA as "accompanying the Armed Forces outside the United States" because he is the spouse of a member of the Armed Forces, resided with the member while in Okinawa Japan, and is not a national nor ordinarily a resident of Japan.  United States v. Arnt, 474 F.3d 1159 (9th Cir. 2007) (spouse of Air Force member properly indicted under MEJA as accompanying the armed forces).

Defendant challenges the constitutionality of MEJA on two grounds.  First, defendant argues that Congress lacks authority to enact statutes which confer extraterritorial jurisdiction over conduct occurring exclusively on foreign territory.  Second, defendant argues that MEJA violates his Sixth Amendment right of compulsory process of witnesses and is therefore unconstitutional.  Defendant's claims are erroneous.  His motion to dismiss the indictment is without merit and should be denied.

III.    <u>**MEJA IS CONSTITUTIONAL**</u>

Acts of Congress are presumed to be constitutional. See, e.g., <u>Munn v. Illinois</u>, 94 U.S. 113, 124 (1876) ("Every statute is presumed to be constitutional").  Courts must exercise caution and reluctance before striking down a statute.  <u>See</u> <u>Parker v. Levy</u>, 417 U.S. 733, 760 (1974) (holding that courts must be "reluctant[ ] to strike down a statute on its face where there [are] a substantial number of situations to which it might validly be applied"); <u>Erznoznik v. City of Jacksonville</u>, 422 U.S. 205, 216 (1975) (emphasizing caution before striking down state statute as facially unconstitutional); <u>United States v. Morrison</u>, 529 U.S. 598, 607 (2000) ("Due respect for the decisions of a coordinate branch of Government demands [a court] invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds").  Accordingly, "[t]he courts ought not to declare one to be unconstitutional, unless it is clearly so.  If there is doubt, the expressed will of the legislature should be sustained."  <u>Munn</u>, 94 U.S. at 124.  A facial challenge to a statute, such as that made by the Defendant, is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."  <u>United States v. Salerno</u>, 481 U.S. 739, 745 (1987); <u>see</u> <u>also</u> <u>United States v. Ballinger</u>, 395 F.3d 1218, 1225 n.2 (11th Cir. 2005) (en banc) (quoting <u>Salerno</u>, 481 U.S. at 745).  The Defendant has failed to show that there is no set of circumstances under which MEJA would be valid.  His facial challenge to the statute therefore fails.  Moreover, any challenge to the indictment as unconstitutional as applied to him also fails for the following reasons.

A.      **CONGRESS HAS PROPER AUTHORITY TO ENACT MEJA**

     1.      **Congress Has Authority to Enact Legislation Conferring Extraterritorial Jurisdiction.**

Congress has the authority to enact laws that extend beyond the territorial boundaries of the United States.  See, e.g., EEOC v. Arabian American Oil Co., 499 U.S. 244, 248 (1991)("Aramco") (superceded by statute, Civil Rights Act of 1991, Pub. L. No. 102-166, § 109(c), 105 Stat. 1071, 1078 (1991)) (citing Foley Bros., Inc. v. Filardo, 336 U.S. 281, 284-285(1949)); see also United States v. Plummer, 221 F.3d 1298, 1304 (11th Cir. 2000) ("Congress unquestionably has the authority to enforce its laws beyond the territorial boundaries of the United States") (citation omitted); United States v. Baker, 609 F.2d 134, 136 (5th Cir. 1980) ("Since an early date, it has been recognized that Congress may attach extraterritorial effect to its penal enactments").[1]  As stated by the Supreme Court in Aramco, "whether Congress has in fact exercised that authority in these cases is a matter of statutory construction."  499 U.S. at 248.  Legislation is generally presumed to apply only within the territorial jurisdiction of the United States "unless a contrary intent appears."  Id.  See also Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 155, 173 (1993).

"There is no constitutional bar to the extraterritorial application of penal laws . . . Numerous decisions have upheld the authority of the United States to enact and enforce criminal laws with extraterritorial effect."  United States v. King, 552 F.2d 833, 850-51 (9th Cir.1976) (citing United States v. Blackmer, 284 U.S. 421, 436-38 (1932)).  Notably, Congress has enacted

---

[1]The Eleventh Circuit is bound by Fifth Circuit decisions handed down prior to September 30, 1981. Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981).

numerous legislation with clear extraterritorial reach on conduct occurring exclusively on foreign territory that have been found to be constitutional and within Congress's power.  See e.g., United States v. Clark, 315 F. Supp. 2d 1127 (W.D. Wa. 2004) (upholding the constitutionality of and Congressional authority to enact 18 U.S.C. § 2423(c) which criminalizes certain conduct occurring exclusively on foreign territory); United States v. Emmanuel, No. 06-20758-CR, 2007 WL 2002452 (S.D. Fla. July 5, 2007) (unpublished) (upholding the constitutionality of and Congressional authority to enact Torture Act, codified at 18 U.S.C. § 2340A, where "the locus of the offense is completely foreign"); United States v. White, 51 F. Supp. 2d 1008 (E.D. Ca. 1997) (upholding Congressional authority to enact 18 U.S.C. § 1119 under which defendant was charged for murder occurring solely on foreign territory); see also Chua Han Mow v. United States, 730 F.2d 1308, 1311 (9th Cir. 1984) (rejecting defendant's argument that the court lacked subject matter jurisdiction over him because all criminal acts were committed on foreign soil and finding that "[t]here is no constitutional bar to the extraterritorial application of penal laws").

Defendant's argument that Congress can only exercise extraterritorial jurisdiction over acts conducted on lands constituting Special Maritime and Territorial Jurisdiction ("SMTJ") is without foundation and is contrary to other statutes with similar extraterritorial jurisdiction passed by Congress.[2]

_____

[2]Additionally, Defendant misapprehends MEJA's jurisdictional scope as applying only to "conduct transpir[ing] exclusively within the sovereign territory of Japan," as compared to lands in foreign countries that fall under the SMTJ definition.  See Defendant's Motion at 4.  MEJA applies to both offenses conducted on U.S. military bases located in foreign countries as well as offenses which occur exclusively on foreign soil.  See generally, 18 U.S.C. § 7(9) (although the definition of SMTJ includes U.S. military bases in foreign states, the statute explicitly does not confer jurisdiction to a person described under MEJA); United States v. Gleason, No. 07-349-KI,

a.      Congress Intended MEJA to Apply Extraterritorially.

To determine whether Congress intended a particular statute to apply extraterritorially, courts first look to the text of the statute.  See United States v. Bowman, 260 U.S. 94, 97-98 (1922).  That Congress intended for MEJA to apply extraterritorially is apparent on the face of the statute.  MEJA is limited to "conduct outside the United States" and can only be applied extraterritorially.  Without extraterritorial application, this statute would be of no value.  Furthermore, the Act is named the "Military Extraterritorial Jurisdiction Act" and 18 U.S.C. § 3261 is entitled "Criminal offenses committed by certain members of the Armed Forces and by persons employed by or accompanying the Armed Forces outside the United States."  See Almendarez-Torres v. United States, 523 U.S. 224, 234 (1998) ("We also note that 'the title of a statute and the heading of a section' are 'tools available for the resolution of doubt' about the meaning of a statute") (internal citations omitted).  There is no ambiguity that MEJA applies extraterritorially.  See Freytag v. Comm'r of Internal Revenue, 501 U.S. 868, 873 (1991) ("When we find the terms of a statute unambiguous, judicial inquiry should be complete except in rare and exceptional circumstances").  All MEJA cases brought have been based on extraterritorial application of MEJA.  See United States v. Arnt, 474 F.3d 1159 (9th Cir. 2007) (Indictment charged voluntary manslaughter under MEJA while defendant was accompanying armed forces in Japan); United States v. Green, No. 5:06-CR-19-R, 2008 WL 4000872 (W.D. Ky. Aug 26, 2008) (unpublished) (Indictment against defendant charging rape and murder of family while in Iraq brought under MEJA).  Indeed, defendant concedes that Congress clearly

2009 WL 799645, at *5 (D. Or. March 24, 2009) (even where the criminal act occurs on property that normally falls within the definition of SMTJ, where the offender is a person described under 18 U.S.C. § 3261, jurisdiction must be brought under MEJA).

11

intended MEJA to be applied extraterritorially and that it only applies in an extraterritorial

context.  See Defendant's Motion at 3.

> b.   International Law Supports Congressional Authority
>       to Enact MEJA.

Where Congressional intent to exercise extraterritorial jurisdiction of the subject offense

is plain from the face of the statute, courts have noted generally that there is no need to analyze

whether the statute comports with international law.  See United States v. Neil, 312 F.3d 419,

422 (9th Cir. 2002).  Because the extraterritorial reach of MEJA is clear, it is not necessary for

the Court to consider the more detailed factors used by courts to determine whether the

extraterritorial application of a statute comports with international law.  See also United States v.

Yousef, 327 F.3d 56, 86 (2nd Cir. 2003) (where the court emphasized that Congress is "not

bound by international law" in determining the reach of extraterritorial statutes, and that "if

[Congress] chooses to do so, it may legislate with respect to conduct outside the United States, in

excess of the limits posed by international law") (internal quotations omitted); Fed. Trade

Comm'n v. Campagnie de Saint-Gobain-Pont-a-Mousson, 636 F.2d 1300, 1323 (D.C. Cir. 1980)

(Courts of the United States are "obligated to give effect to an unambiguous exercise by the

Congress of its jurisdiction to prescribe even if such an exercise would exceed the limitations

imposed by international law").

Nonetheless, where possible, the exercise of extraterritorial jurisdiction should comport

with international law.  See, e.g., Plummer, 221 F.3d at 1307; Garcia-Mir v. Meese, 788 F.2d

1446, 1453 (11th Cir. 1986) (citing Murray v. The Schooner Charming Betsy, 6 U.S. (2 Cranch)

64 (1804)); c.f. United States v. Vasquez-Velasco, 15 F.3d 833, 839 (9th Cir. 1994) ("In

determining whether a statute applies extraterritorially, we also presume that Congress does not

intend to violate principles of international law").  A study of international law supports the exercise of extraterritorial jurisdiction under MEJA.  International law recognizes the exercise of criminal jurisdiction by a nation under five general principles.  These include the territorial, national, protective, universality, and passive personality principles.  See, e.g., Rivard v. United States, 375 F.2d 882, 885 (5th Cir. 1967); see also United States v. Romero-Galue, 757 F.2d 1147, 1154 n.20 (11th Cir. 1985) (recognizing that "[t]he law of nations permits the exercise of [extraterritorial] criminal jurisdiction by a nation under five general principles" which include territorial, national, protective, universality and passive personality principles") (citing Rivard, 375 F.2d at 885).

MEJA's presumption of constitutionality under the law and Congress's clear intent for extraterritorial jurisdiction under MEJA is sufficient for this court to exert jurisdiction in this case.  Furthermore, defendant neither alleges nor demonstrates how MEJA would violate international law.  Nonetheless an analysis under international law supports that MEJA comports with international law and is supported by four of the five general principles, any one which by itself sufficiently supports the indictment.  See Chua Han Mow, 730 F.2d at 1312 ("Extraterritorial application of penal laws may be justified under any one of the five principles of extraterritorial authority") (quoting King, 552 F.2d at 850).  As discussed infra, the MEJA charge as applied to defendant Williams is consistent with the national, passive personality, territorial, and universality principles of international law.

### 2.    Jurisdiction Based on Citizenship of the Defendant

The power of the United States to criminalize the extraterritorial acts of its nationals is inherent in sovereignty, and stands apart from powers enumerated in the Constitution.  See

Blackmer, 284 U.S. at 437.  The Supreme Court has stated broadly that, while Congressional legislation is generally construed to apply only within the territorial jurisdiction of the United States unless a contrary intent appears, "the question of its application, so far as citizens of the United States in foreign countries are concerned, is one of construction, not of legislative power."  Id.

Controlling precedent in the Eleventh Circuit also recognizes that, under international law, nationality alone supports the exercise of extraterritorial jurisdiction.  See United States v. Mitchell, 553 F.2d 996, 1001 (5th Cir. 1977) (noting that "citizenship alone is generally recognized as a relationship sufficient to justify the exercise of jurisdiction by a state") (citing Restatement (Second) of Foreign Relations Law of the United States (1965) § 30); Plummer, 221 F.3d at 1307 (finding jurisdiction over defendant under the nationality principle of international law, "which permits a state to exercise criminal jurisdiction over one of its nationals"); United States v. Columba-Colella, 604 F.2d 356, 358 (5th Cir. 1979) (recognizing that "a country may supervise and regulate the acts of its citizens both within and without its territory"); see also King, 552 F.2d at 850-52 (stating that there is "no constitutional bar to the extraterritorial application of penal laws" and suggesting that authority over United States citizens overseas is a source of Congressional legislative power); United States v. Walczak, 783 F.2d 852, 854-55 (9th Cir. 1986) (treating nationality principle as a sufficient basis for the exercise of subject matter jurisdiction).

That Congress has authority to enact statutes with extraterritorial reach over its citizens in foreign countries is not disputed.  Rather, the determinative question is whether Congress chose to exercise such authority in a statute.  See United States v. Cotten, 471 F.2d 744, 749 (9th Cir.

1973) (in discussing Congressional authority to enact statutes with extraterritorial reach, the court noted that "the question of its application, so far as citizens of the United States in foreign countries are concerned, is one of construction, not of legislative power") (citing Blackmer, 284 U.S. at 437).

Even where courts have declined to apply extraterritorial jurisdiction to certain statutes, the bases for these decisions was one of Congressional intent rather than authority.  That is, although the court recognized Congress's authority to extend extraterritorial jurisdiction, analysis of the statute at issue did not evince such Congressional intent.  For example, in United States v. Mitchell, 553 F.2d 996 (5th Cir. 1977), the court explicitly recognized that Congress could have exercised authority over the acts of United States citizens in foreign territorial waters based on Congressional authority to control the conduct of American citizens overseas, but chose not to do so in enacting the statute at issue.  The court citing a number of Supreme Court precedent stated that "[t]he Supreme Court has held repeatedly that the legislative authority of the United States over its citizens extends to conduct by Americans on the high seas and even within the territory of other sovereigns."  Id. at 1001.  See also United States v. Gatlin, 216 F.3d 207, 211 (2nd Cir. 2000) (while the court construed the statute at issue there against extraterritorial jurisdiction, the court acknowledged the undisputed Congressional authority to regulate the conduct of its nationals outside the territorial boundaries of the United States and recognized "the issue in this case is one of congressional intent – that is, statutory construction – not of congressional power").

The benefits of United States citizenship also carry the obligation to follow applicable laws.  That Congress enacted MEJA to hold its citizens accountable for their actions is supported

by its legislative history and is consistent with the national principle of international law.

> This legislation is consistent with one of the recommendations of the Overseas Jurisdiction Advisory Committee in a report issued in response to Section 1151 of the National Defense Authorization Act for Fiscal Year 1996 (Public Law 104-106, 110 Stat. 186 (1996)).  This report concluded that the inability of the United States to hold its citizens criminally accountable for offenses committed overseas has undermined deterrence and resulted in injustice.

H.R. REP. 106-778(I) (2000), 2000 WL 1008725, at *20 (Leg. Hist.).  Defendant's argument that Congress is restricted to enumerated powers in enacting extraterritorial reach was addressed and rejected by the court in United States v. White, 51 F. Supp. 2d 1008 (E.D. Ca. 1997).

The defendant in White was a United States citizen and civilian who was indicted under 18 U.S.C. § 1119 for the murder of her two year old American son while she was residing in Japan.  51 F. Supp. 2d at 1010.  Section 1119(b) provides that "[a] person who, being a national of the United States, kills ... a national of the United States while such national is outside the United States but within the jurisdiction of another country shall be punished as provided under sections 1111, 1112, and 1113."  Similar to MEJA, Section 1119(b) makes no mention of any enumerated power.  The court there rejected defendant's claim that Congress is restricted to enumerated powers in enacting statutes with extraterritorial reach, recognizing that "[i]t is pellucid Congress possesses external sovereignty authority to pass criminal laws proscribing its nationals' outlaw conduct against other nationals abroad."  Id. at 1011.  Further, the court upheld the nationality principle noting that "under international law, a nation may generally assert jurisdiction over its citizens."  Id. at 1011 (citing United States v. Juda, 46 F.3d 961, 967 (9th Cir. 1995)); Cotten, 471 F.2d at 749-50 (Congress' authority to enact extraterritorial statute is both constitutionally and internationally permissible under the nationality and territorial principles of international law).

Numerous courts have discussed and affirmed the authority of Congress to apply criminal statutes to the activities of United States citizens overseas.  These decisions indicate that the exercise of such jurisdiction comports with both international law and constitutional protections.  While the contexts of these discussions vary, they generally indicate that citizenship alone is sufficient to justify the exercise of jurisdiction over United States citizens for acts committed overseas.  See, e.g., Mitchell, 553 F.2d at 1001 (noting that "citizenship alone is generally recognized as a relationship sufficient to justify the exercise of jurisdiction by a state."); United States v. Reeh, 780 F.2d 1541, 1543 n.2. (11th Cir. 1986) (stating that a state may punish the wrongful conduct of its citizens no matter where it takes place); Plummer, 221 F.3d at 1307 (noting that the nationality principle "permits a state to exercise criminal jurisdiction over one of its national... Plummer is concededly a United States citizen, and therefore exercising jurisdiction over him in this case is proper.") (internal citations omitted).  See also United States v. Hill, 279 F.3d 731, 740 (9th Cir. 2002); United States v. Harvey, 2 F.3d 1318, 1329 (3rd Cir. 1993).  Congress has clear authority to enact statutes with extraterritorial reach over its citizens.  Defendant is a United States citizen and as such this court has jurisdiction under the well-established nationality principle of international law.

### 3.   Jurisdiction Based on Citizenship of the Victim

The passive personality principle of international law recognizes extraterritorial jurisdiction of a criminal statute based on the nationality of the victim.  United States v. Benitez, 741 F.2d 1312, 1316 (11th Cir. 1984).   "International law does not prohibit Congress from incorporating [the passive personality] principle into its legislation."  United States v. Roberts, 1 F. Supp. 2d, 601, 607 (E.D. La. 1998).  Indeed Congress has recognized its authority under the

passive personality principle by enacting several pieces of legislation based on this jurisdictional principle.  See id. (Congress's "move towards accepting passive personality jurisdiction continued with the passage of § 7(8)").  The Eleventh Circuit, along with other circuits, has recognized and applied the passive personality principle of international law to support extraterritorial jurisdiction.  See Benitez, 741 F.2d at 1316 ("we have no doubt that [extraterritorial] jurisdiction exists in this case" under the protective principles and the passive personality principle, where the victims are both U.S. citizens);  Neil, 312 F.3d at 422 (applying the passive personality principle to justify the exercise of extraterritorial jurisdiction in a prosecution for sexual contact with a minor in violation of 18 U.S.C. § 2244(a)(3) where the victim was an American citizen); Hill, 279 F.3d at 740 (exterritorial jurisdiction found based in part on the passive personality principle for violation of child support payments where the victims ex-wife and children were all United States citizens and suffered harm as a result of defendant's crime).

The jurisdictional gap that Congress purposefully addressed by enacting MEJA expressly contemplated extraterritorial jurisdiction over crimes against American victims.

> [H]ost countries often do not choose to assert their jurisdiction to try American civilians who commit crimes in their countries.  This is most often the case when the crime was committed against another American or against property owned by an American or the United States Government.  When the citizens or property of the host nation are not damaged by an act, that nation often has little interest in spending the time and resources of its police, prosecutors, and courts to try Americans for the crime and will decline to bring a case.  When this happens, however, the perpetrator goes unpunished for his crime.

H.R. REP. 106-778(I) (2000), 2000 WL 1008725, at *7 (Leg. Hist.).  Indeed, the important governmental interest in addressing crimes against American victims extraterritorially was one of the needs that Congress enacted MEJA to address.  See id. at *10 (MEJA's legislative history

notes that "as many of the crimes going unpunished are committed against American victims and American property, the Government has an interest in using its law to punish those who commit these crimes").

The Indictment in this case alleges aggravated sexual abuse and abusive sexual contact of a female child under the age of 12 in violation of 18 U.S.C. §§ 3261, 2241(c), and 2244(a). The victim in this case is an American citizen. This is exactly the type of crime that Congress contemplated reaching when it enacted MEJA.

> Because many crimes, such as sexual assault, arson, robbery, larceny, embezzlement, and fraud, currently do not have extraterritorial effect, there is a "jurisdictional gap" that, in many case, allows such crimes to go unpunished. Although host foreign nations have jurisdiction to prosecute such acts committed within their nation, they frequently decline to exercise jurisdiction when an American is the victim or when the crime involves only property owned by Americans. H.R. 3380 would close this gap by establishing a new Federal crime involving conduct that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States.

H.R. Rep. 106-778(I) (2000), 2000 WL 1008725, at *5 (Leg. Hist.). The victim's status as a United States citizen coupled with the clear Congressional intent of MEJA to address crimes committed in foreign countries against U.S. citizens demonstrates a consistency with the passive personality principle of international law and supports jurisdiction in this case.

### 4.       Jurisdiction Based on the Territorial Principle

"Under the territorial jurisdiction theory, jurisdiction is appropriate if the acts performed outside the United States produce detrimental effects within the United States." Hill, 279 F.3d at 739-40. Controlling law in this Circuit recognizes the territorial principle. Rivard, 375 F.2d at 885-86 (recognizing extraterritorial jurisdiction based on the territorial principle of international law) (citing Ford v. United States, 273 U.S. 593); Plummer, 221 F.3d at 1305 ("courts in this

19

Circuit and elsewhere have routinely inferred congressional intent to provide for extraterritorial jurisdiction over foreign offenses that cause domestic harm"); see generally United States v. Baker, 609 F.2d 134, 138 (5th Cir. 1980) ("The objective territorial principle has been asserted successfully where there was proof that defendant's actions [ ] produced some effect within the United States").

The court in United States v. Neil, 312 F.3d 419 (9th Cir. 2002), found sufficient detrimental effects within the United States to justify extraterritorial jurisdiction based on the territorial principle where the offense, like the instant case, involved sexual contact of a minor in violation of 18 U.S.C. § 2244(a)(3).  In determining whether the conduct sufficiently affected the United States to warrant the application of the territorial principle to support extraterritorial jurisdiction, the court found that it was sufficient that the victim was an American citizen who lives and attends school in the United States, and who sought counseling in the United States as a consequence of the sexual assault.  Id. at 422.

In the instant case, the victim is an American citizen, who as a result of defendant's sexual abuse of her in Japan had difficulty at school, was ultimately expelled, attempted suicide while residing in Georgia, and attended counseling.  Courts have found such similar effects to a victim to constitute sufficient detrimental effects to the United States to invoke the territorial principle of jurisdiction.  See id.; see also United States v. Pizdrint, 983 F. Supp. 1110, 1112-13 (M.D. Fla. 1997) (applying the territorial principle to find extraterritorial jurisdiction based on finding that defendant's assault of legal permanent resident has detrimental effect on the United States); Roberts, 1 F. Supp. 2d at 508 (finding extraterritorial jurisdiction based on territorial principle where defendant sexual assaulted American); Hill, 279 F.3d at 739-40 (where the court

20

extended extraterritorial jurisdiction in part under the territorial principle, finding defendant's evasion of child support payments had adverse effects in the United States).  The territorial principle of international law supports the finding of jurisdiction in this case.

     **5.**      **Jurisdiction Based on the Universality Principle of International Law**

The universality principle of international law provides "jurisdiction over extraterritorial acts so heinous as to be universally condemned." Clark, 315 F. Supp. 2d at 1131.  Courts in the Eleventh Circuit have recognized the general principle of extraterritorial jurisdiction based on the universality principle.  See generally Rivard, 375 F.2d at 885; Emmanuel, No. 06-20758-CR, 2007 WL 2002452, at *10 (unpublished) (Congressional authority to extend extraterritorial jurisdiction in Torture Act based on recognition of international prohibition against torture as a norm of international law).  The court in Clark, found that Congress had authority to exercise extraterritorial jurisdiction under the universality principle of international law, in enacting 18 U.S.C. § 2423(c) because that statute criminalized sexual abuse of children committed by Americans abroad.  315 F. Supp. 2d at 1131.  In determining the applicability of the universality principle to confer extraterritorial jurisdiction, the court found that sexual abuse of children is universally condemned.  Id.  In the instant case, the indictment as applied to defendant Williams alleges aggravated sexual abuse of a child and abusive sexual contact with a child committed by person accompanying member of the Armed Forces outside of the United States.  As noted in Clark, such acts of child sex abuse are universally condemned and extraterritorial jurisdiction in the instant case is consistent with the universality principle of international law.

     **6.**      **Inherent Congressional Power to Legislate in
External Affairs in Foreign Relations Matters**

In addition to the broad power to punish the acts of United States citizens overseas, the

extraterritorial reach of federal criminal laws is grounded in the inherent power to legislate in external affairs and matters touching on foreign relations.  The Supreme Court plainly drew this distinction in United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 315 (1936), in which it recognized the "differences between the powers of the federal government in respect to foreign or external affairs and those in respect of domestic or internal affairs."  As the Court explained, the "broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution ... is categorically true only in respect to our internal affairs."  Id. at 315-16.  In United States v. Lopez, 514 U.S. 549, 549 (1995), the Supreme Court reiterated that the "Constitution creates a Federal Government of enumerated Powers." This "first principle" was, however, described by the Court as stemming from the division of power between the States and the Federal Government; the Court in Lopez went on to quote James Madison, noting that "[t]he powers delegated by the proposed Constitution to the federal government are few and defined.  Those which are to remain in the State governments are numerous and indefinite."  Id., quoting The Federalist No. 45, pp. 292-293.  Rossiter ed. 1961).  The Lopez decision further ties its discussion of enumerated powers to concern for the preservation of the power of the States by emphasizing that "a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front."  Id. (quoting Gregory v. Ashcroft, 501 U.S. 452, 458 (1991)).

That the Supreme Court's sweeping recognition of federal power in external affairs survived Lopez was recognized by a panel of the Ninth Circuit Court of Appeals in United States v. Hernandez-Guerrero, 147 F.3d 1075 (9th Cir. 1998).  In Hernandez-Guerrero, the court upheld Congress's authority to pass criminal immigration legislation, relying on the fact that, although

the immigration power is not enumerated in the Constitution, it has been "universally acknowledged that Congress possesses authority over immigration policy as 'an incident of sovereignty.'" Id. (quoting Chae Chan Ping v. United States, 130 U.S. 581, 609 (1889)).  The court in Hernandez-Guerrero further explained that Congress's power to enact criminal immigration laws derives from a concern for "our relation with foreign countries" and that, therefore, Congress is not bound by the "rigid constraints" that limit its power in domestic contexts.  147 F.3d at 1077.  Because Congressional authority to enact the immigration legislation at issue in Hernandez-Guerrero was firmly based in Congress's inherent power over immigration, the court explicitly declined to rely on Congress's enumerated power under the foreign commerce clause.  Id. at 1078.

MEJA's legislative history evinces Congress's intent to affect U.S. foreign relations through its enactment.  At the House Bill hearings held by the Subcommittee on Crime, the Associate Deputy General Counsel of the Department of Defense testified about the need to pass MEJA to assist in foreign relations.

> The inability of the United States to appropriately pursue the interests of justice and hold its citizens criminally accountable for offenses committed overseas has undermined deterrence, lowered morale, and threatened good order and discipline in our military communities overseas.  In addition, the inability of U.S. authorities to adequately respond to serious misconduct within the civilian component of the U.S. Armed Forces, presents the strong potential for embarrassment in the international community, increases the possibility of hostility in the host nation's local community where our forces are assigned, and threatens relationships with our allies.

H.R. REP. 106-778(I) (2000), 2000 WL 1008725, at *9 (Leg. Hist.).  Additionally, the Acting General Counsel for the Department of Defense noted that the passage of MEJA would "help maintain United States foreign policy and national security interests."  Id. at 20.  MEJA's

legislative history evinces that the passage of MEJA was in part influenced by foreign relations concerns.

The court in <u>White</u>, 51 F. Supp. 2d 1008, rejected the same argument that defendant is making in the instant case.  The defendant in <u>White</u>  argued that the court lacked jurisdiction over her because Congress did not have enumerated Article I powers to enact 18 U.S.C. § 1119, the statute under which she was charged.  <u>Id.</u> at 1010.  The court firmly rejected defendant's argument finding that "Congress possesses external sovereignty authority to pass criminal laws proscribing its nationals' outlaw conduct against other nationals abroad" is inherent in its power over foreign or external affairs.  <u>Id.</u> at 1011.

> Defendant's argument fails to recognize the "differences between the powers of the federal government in respect to foreign or external affairs and those in respect of domestic or internal affairs."  "The broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution ... is categorically true only in respect to our internal affairs.".…As the Supreme Court explained in <u>Curtiss-Wright Corp.</u>, there are "fundamental" differences between federal power in the domestic area, and federal power in relation to foreign affairs:
>
> > The broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers, is categorically true only in respect to our internal affairs.… And since the states severally never possessed international powers, such powers could not have been carved from the mass of state powers but obviously were transmitted to the United States from some other source.

<u>Id.</u> at 1010-11 (quoting <u>Curtiss-Wright Export Corp.</u>, 299 U.S. at 315-16).[3]  <u>See also United</u>

---

[3] Additionally, "Congress possesses external sovereignty authority" implicitly apart from the Constitution "to pass criminal laws proscribing its nationals' outlaw conduct against other nationals abroad."  <u>White</u>, 51 F. Supp. 2d at 1011 (citing <u>Curtiss-Wright Export Corp.</u>, 299 U.S. at 315-16).

States v. Clark, 435 F.3d 1100, 1109 n.14 (9th Cir. 2006) ("[G]iven our charge to uphold the statute absent a plain showing that it is unconstitutional, we acknowledge that Congress's plenary authority over foreign affairs may also provide a sufficient basis [to enact] § 2423(c)") (citing Morrison, 529 U.S. 607).

Congress possesses broad authority to legislate in areas touching on foreign relations, particularly with regard to American citizens overseas.  See Curtiss-Wright, 299 U.S. at 315-16; Blackmer, 284 U.S. at 437.  See also Clark, 435 F.3d at 1109 n.14 ("[C]omplete power over international affairs is in the national government ...") (citing United States v. Belmont, 301 U.S. 324, 331 (1937)).  Thus, Congress also has proper authority to enact MEJA under its plenary authority over foreign affairs.[4]

### B.     MEJA DOES NOT VIOLATE THE SIXTH AMENDMENT

#### 1.     MEJA Does Not Violate the Sixth Amendment Compulsory Process Clause.

Defendant's also argues that MEJA is unconstitutional alleging that the statute violates his Sixth Amendment right to compulsory process.  Specifically, defendant argues that where alleged criminal conduct by a United States citizen occurs in a foreign country, prosecuting the United States citizen in a United States court violates the Sixth Amendment Right to compulsory process because the defendant lacks the ability to subpoena foreign witnesses.  Courts have consistently rejected this argument and held constitutional the extraterritorial application of

---

[4]  This does not lessen recognition in a long line of cases that the power to extend federal criminal laws to acts of United States citizens overseas is inherent in sovereignty.  While it is not necessary to rely on this inherent power, broad judicial recognition of the sweeping nature of this power should direct the Court's assessment of the statutes at issue in this case and should lead to the conclusion that MEJA is within Congress's constitutional power.

criminal statutes.  United States v. Yousef, 327 F.3d 56, 114 n.48 (2nd Cir. 2003) (the court's inability to subpoena defense witnesses located in a foreign country did not deprive defendants of a constitutional right); United States v. Moussaoui, 382 F.3d 453, 464 (4th Cir. 2004) (acknowledging that the courts' inability to subpoena witnesses from foreign countries does not violate the compulsory process clause of the Sixth Amendment); United States v. Sensi, 879 F.2d 888, 899 (D.C. Cir. 1989) ("It is well settled that a defendant's inability to subpoena foreign witnesses is not a bar to criminal prosecution"); United States v. Wolfson, 322 F. Supp. 798, 819 (D. Del. 1971) ("[T]he mere fact that an American court lacks the power to subpoena witnesses, other than American citizens, from foreign countries, thus preventing a defendant from obtaining compulsory process for witnesses in his behalf, does not make any resulting conviction unconstitutional under the Sixth Amendment"); United States v. Haim, 218 F. Supp. 922, 925-27 (S.D.N.Y. 1963) (right to compulsory process arises only "where it is within the power of the federal government to provide it" and therefore the Sixth Amendment is not violated due to defendants' inability to subpoena potential foreign witnesses) (citing United States v. Greco, 298 F.2d 247, 251 (2nd Cir. 1962)).  See also Emmanuel, No. 06-20758-CR, 2007 WL 2002452, at *17 (unpublished) ("[i]t is [ ] not unconstitutional for the Government to prosecuted a case where most of the physical evidence and witnesses are located in foreign countries.") (citing Greco, 298 F.2d at 251).

Should defendant have particular witnesses in Japan who would provide testimony material to his defense, and should such witnesses refuse to travel to the United States to testify at trial, there are other avenues to obtain such testimony.  Under Fed. R. Crim. P. 15(a), the court may order depositions in "exceptional circumstances and in the interest of justice" "in order to

preserve testimony for trial."  Fed. R. Crim. P. 15(a).  See also Sensi, 879 F.2d at 899

(recognizing Rule 15 depositions and letters rogatory as alternative methods to obtaining

testimony from foreign witnesses); United States v. Sun Myung Moon, 93 F.R.D. 558 (S.D.N.Y.

1982) (permitting Rule 15 depositions of foreign witnesses).

Indeed, defendant's failure to motion this court for Rule 15 depositions, or indicate the

existence and identity of any defense witnesses located in Japan, belies his argument that the

charges as applied to him violates his right to subpoena witnesses.  See e.g., Wolfson, 322 F.

Supp. at 820-22 (in dismissing defendant's compulsory process argument, the court noted that

the defense failed to motion the court for a Rule 15 deposition of a foreign witness, nor requested

the government to assist in procuring the foreign witness).  MEJA does not violate the

compulsory process clause of the Sixth Amendment and this court should deny defendant's

motion to dismiss.

### 2.        Venue is Proper in the Middle District of Georgia

The United States Constitution establishes the defendant's right to be prosecuted "in the

State where the said Crimes shall have been committed . . ."  U.S. Const. Art. III, § 2 cl. 3.  The

Sixth Amendment further provides that a defendant "shall enjoy the right to a speedy and public

trial, by an impartial jury of the State and district wherein the crime shall have been committed."

U.S. Const. Amend. VI.; see also Federal Rule of Criminal Procedure 18 (requiring that a

prosecution proceed  in a district in which the offense is committed).  Citing this provision of the

Sixth Amendment and Article III of the Constitution, defendant argues that venue is improper in

Georgia as the conduct at issue occurred in Japan.  Defendant's Motion at 11-12.  Neither the

Sixth Amendment nor Article III, Section 2 of the Constitution supports Defendant's position.

First, the Sixth Amendment specifically articulates proper venue to be in a particular state, not a particular country.  Furthermore, the proper district is one that "shall have been previously ascertained by law."  U.S. Const. amend. VI.  In addition to the portion cited by defendant, Article III, Section 2 of the Constitution continues to clarify that when an offense is "not committed within any state, the trial shall be at such place or places as the Congress may by law have directed."  U.S. Const. Art. III, § 2.  The Constitution therefore contemplates that Congress may exercise jurisdiction over offenses committed outside of any State and will therefore need to establish venue provisions for such offenses (as Congress has in 18 U.S.C. § 3238,  governing "[o]ffenses not committed in any district").

If the criminal statute of prosecution lacks an express venue provision, the court employs the two-pronged test set forth by the United States Supreme Court in United States v. Rodriguez-Moreno, 526 U.S. 275, 279 n.1 (1999), whereby the court determines proper venue based on the nature and location of the offense.  Under the Rodriguez-Moreno test, venue may lie where any of the "essential conduct elements" occurred.  526 U.S. at 280.  If the Rodriguez-Moreno test however establishes that the offense was committed in a foreign district, then statutory provisions and Federal Rule of Criminal Procedure 18 govern the venue for criminal prosecution.  Moore's Federal Practice § 618.03(1) (3d ed.2000).  Defendant does not dispute that the offense at issue occurred in a foreign location.  Defendant's Motion at 13.  Therefore, 18 U.S.C. § 3238 would apply to determine the proper venue in the instant case.

Title 18 U.S.C. § 3238 entitled "offenses not committed in any district" provides in relevant part, "[t]he trial for all offenses begun or committed upon the high seas or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender .

. . is arrested or is first brought; but if such offender or offenders are not so arrested or brought

into any district, an indictment or information may be filed in the district of last known residence

of the offender . . . ."  18 U.S.C. § 3238 (2009).

Defendant was arrested in Camilla, Georgia, and therefore venue is proper in the Middle

District of Georgia.  Additionally, defendant's last known address was in Lanier County,

Georgia.  Accordingly, the underlying indictment in this case was properly filed in the Middle

District of Georgia.  The Middle District of Georgia is the proper district to bring this case in

accordance with the applicable law, and therefore does not violate the venue provision of the

Sixth Amendment.

### C.    <u>CONCLUSION</u>

The presumption of constitutionality attaches to acts of Congress.  It is well established

that Congress has authority to enact legislation with extraterritorial jurisdiction and that

Congress chose to exercise that authority by its clear intent for MEJA to be applied

extraterritorially.  The  extraterritorial application of MEJA as applied to defendant Williams is

also supported by the national, passive personality, territorial, and universality principles of

international law.  Additionally, Congress' inherent power to legislate external affairs in foreign

relations supports jurisdiction in this case.  Finally, MEJA does not violate the compulsory

process clause of the Sixth Amendment and venue is proper in the Middle District of Georgia.


For the foregoing reasons, this Court should deny defendant's motion to dismiss the

Indictment.

RESPECTFULLY SUBMITTED,
G.F. PETERMAN

ACTING UNITED STATES ATTORNEY

By:     s/ JIM CRANE
Assistant United States Attorney
Jim.Crane@usdoj.gov

s/ MI YUNG CLAIRE PARK
Mi Yung Claire Park (CA bar 202379)
Trial Attorney - Child Exploitation and
Obscenity Section
1400 New York Ave., NW - Suite 600
Washington, D.C. 20005
(202) 616-2780; Fax: (202) 514-1793
miyung.park@usdoj.gov

## CERTIFICATE OF SERVICE

I, Mi Yung C. Park, hereby certify that on the 11th day of December, 2009, I

electronically filed the within and foregoing with the clerk of the Court using CM/ECF system

which will send notification of such filing to the following:

Morad Fakhimi &
Nicole Williams
Federal Defenders of the
Middle District of Georgia, Inc.
440 Martin Luther King, Jr. Boulevard, Suite 400
Macon, GA 31201
Morad_fakhimi@fd.org
Attorney for Defendant

s/ JIM CRANE
Assistant United States Attorney
Jim.Crane@usdoj.gov